UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAURICE NEWSON,                                    Case  No. 09-10346

         Plaintiff,                               Avern Cohn
                                                   United States District Judge

vs.

                                                   Michael Hluchaniuk
JOHN T. STEELE, *et al.*,                          United States Magistrate Judge

         Defendants.

_____/

**REPORT AND RECOMMENDATION
DEFENDANTS' MOTIONS TO DISMISS
OR FOR SUMMARY JUDGMENT (Dkt. 22, 38)**

## I.    PROCEDURAL HISTORY

This is a prisoner civil rights action filed on January 29, 2009.  (Dkt. 1).

Plaintiff alleges that defendants violated his constitutional rights pursuant to 42

U.S.C. § 1983.  This case was referred to the undersigned by District Judge Avern

Cohn on February 25, 2009.  (Dkt. 6).  Defendant Correctional Medical Services,

Inc. (CMS) filed a motion to dismiss on March 20, 2009.  (Dkt. 22). Plaintiff filed

a response on April 10, 2009.  (Dkt. 30). CMS then filed a reply and plaintiff filed

a surreply.  (Dkt. 34, 36).  Defendants Straub, Armstrong, Slick, Gardon, Gilbert,

Caruso, and Wilson (all employees of the Michigan Department of Corrections)

filed a motion to dismiss or for summary judgment on April 20, 2009.  (Dkt. 38).

Plaintiff filed a response on May 18, 2009. (Dkt. 47). These motions are now ready for report and recommendation.

For the reasons set forth below, the undersigned **RECOMMENDS** that the MDOC defendants' motion to dismiss be **GRANTED** in part, that the MDOC defendants' motion for summary judgment be **GRANTED** in part, and that CMS's motion to dismiss be **GRANTED**.

## II.      STATEMENT OF FACTS

Plaintiff asserts several theories of recovery that essentially boil down to interference with prescribed medical treatment. Although he claims violations of his Fourteenth Amendment right to equal protection, his Eighth Amendment right to be free from cruel and unusual punishments, the Free Exercise Clause of the First Amendment, "the Bill of Rights," "Conversion," and "both the State and Federal Constitutions," the undersigned agrees with defendants characterization of the complaint that it is limited to allegations of interference with plaintiff's medical care. Specifically, plaintiff seeks compensatory and punitive damages and an order requiring that his medical treatment be placed under the care of the University of Michigan Liver Transplant Team. Plaintiff is a liver transplant patient and he claims that all of the named defendants interfered with his medical treatment and/or failed to intervene on his behalf on various occasions beginning in 2005. Based on his responses to the dispositive motions, plaintiff does not appear to

dispute that his claims are based on alleged violations of his Eighth Amendment rights.

A.     MDOC Grievance Procedure

The MDOC grievance procedure explains that "[g]rievances may be submitted regarding alleged violations of policy or procedure or unsatisfactory conditions of confinement which directly affect the grievant."  (Dkt. 38, Ex. B). The grievance procedure also requires that the information provided "shall be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how)" and that "[d]ates, times, places and names of all those involved in the issue being grieved are to be included." *Id*.  Grievants are encouraged, however, to limit the information in the grievance form and to state the issue briefly.  *Id*.

Within five days of attempting to resolve a dispute with staff, a prisoner may send a completed grievance form to the Step I Grievance Coordinator designated for the facility.  *Id*.  And, if the merits of the grievance are addressed, the grievant must be interviewed in order to "explain the grievance more completely" and to enable the respondent to "gather any additional information needed to respond to the grievance."  *Id*.  If the grievant is not interviewed, the reason must be included in the written response to the grievance.  *Id*.  In response to the Step I grievance, the respondent must identify all policies, rules, or procedures that are related to the issue or conduct grieved.  *Id*.  At Step I, the Grievance Coordinator "shall ensure

that a thorough investigation was completed for each Step I grievance accepted"
and that the response was reviewed by the appropriate supervisor. *Id.*

If a grievant is not satisfied with the Step I response or does not receive a
timely response, he may request an appeal of the Step I grievance to Step II. *Id.*   If
the Grievance Coordinator determines that the Step II grievance should be
accepted, he must then assign an appropriate respondent.  *Id.*  The MDOC
grievance procedure sets forth the appropriate respondents for Step II, depending
on the location and subject matter of the grievance.  *Id.*   For example, if a
grievance alleges inadequate medical care, the Regional Health Administrator or
designee is the appropriate Step II respondent.  *Id.*   Or, if a prisoner is housed in a
CFA or SAI facility, the Warden or Deputy Warden is the appropriate respondent.
*Id.*  The Grievance Coordinator shall then ensure that "any additional investigation
was completed as necessary for each Step II grievance accepted...." *Id.*

If a prisoner is not satisfied with the Step II response, he may file a Step III
grievance with the Prisoner Affairs Section.  *Id.*  The Prisoner Affairs Section is
the respondent for a Step III grievance on behalf of the MDOC Director. *Id.*  If a
Step III grievance involves medical care or treatment, the Prison Affairs Section
must forward any such grievance to the Bureau of Health Care Services (BHCS),
who shall ensure that the grievance is investigated and a timely response provided.

*Id.* The Manager of the Prisoner Affairs Section shall ensure that any additional investigation is completed as necessary for Step III. *Id.*

  B.  <u>Plaintiff's Grievances</u>

    1.  JCF050300649012F

Plaintiff filed a grievance on February 16, 2005 arising from events that occurred on February 5, 2005. (Dkt. 38, Ex. C). After his liver transplant at the University of Michigan hospital, plaintiff claims that he was refused medical care and specifically, was not given his anti-rejection drugs. According to plaintiff, this caused him to have to return to the hospital two days later for the drugs. *Id.* According to the Step I investigation:

> Mr. Newson was to return from the U of M with a week's supply of medications. As it was discussed before his discharge from the JMF dialysis center, upon discharge (from the U of M), he was to go through DWH ER then return to JMF. Instead, he was sent to JMF Friday night after the nursing station was closed. His medications were ordered by his MSP, however, they are not on the State wide formulary and that is why the request was made to have ... him returned with a week's supply of medications.
>
>        * * *
>
> The confusion in placement of Mr. Newson was a factor in his not receiving his required medication, he was to have been returned to JMF, which has a dialysis unit, and a supply of the required medication was to have been sent with him. On his second discharge from the U of M he was sent to JMF and the medications came with him then.

(Dkt. 38, Ex. C).  On April 28, 2005, plaintiff appealed this decision to Step II, stating that he did not receive a copy of the Step I response.  Defendants did not attach a copy of the Step II response, but it appears to be attached to plaintiff's complaint.  (Dkt. 1, p. 18).  The Step II response also appears to be addressing another complaint lodged by plaintiff (the confiscation of a wheelchair), rather than the medication issue identified in the Step I grievance.  *Id*.  Plaintiff asserts that he did not receive any Step II response.  (Dkt. 38, Ex. C).

On May 30, 2005, plaintiff appealed to Step III.  According to plaintiff, the sequence of events outlined in the Step I response is inaccurate and false.  (Dkt. 38, Ex. C).  According to plaintiff:

> These assertions are unfounded ... as JCF was the facility I left to U of M from in the first placed, and when I returned from U of M to JCF on Friday night as stated I had the required dose of medication for the 'that night' upon my discharge from U of M.  However, as stated, DWH filled the prescription that U of M had prescribed and ordered it to be picked up by the JCF Nursing staff, which was clearly marked in my medical charged and explained to me by the intake nursed that night.  Even if the nurses station was closed that night my medication was still ordered; my medical chart was there for your employee to follow-up on, and the medication was available for pick up that following morning.
>
> I requested my medication Saturday, Feb. 5, 2005 along with my insulin shot of which Nurse Ives blatantly refused to provide; this medication was available as my insulin was, and as stated C. Ives instructed staff at the time of my request that "He can wait until Monday!"

> instead of following clearly established modes of
> procedures and provided me with the medical attention as
> needed.  This had absolutely nothing to do with the MSP
> ordering my medication, and nothing to do with the state
> wide formulary or a request to have me returned with a
> weeks supply as fabricated by investigating staff, B.
> Gardon, moreover this has nothing to do with any alleged
> confusion in placement as my medication, chart, and
> medical needs was at this nurses disposal as I was seen
> Friday night on Feb. 4, 2005, by the intake Nurse
> contrary to the investigation.

(Dkt. 38, Ex. C).  The Step III response, dated October 14, 2005, says, "As noted in

Step I, grievant is right.  This should not have occurred.  Administrative action has

been taken to ensure that medication is available or obtained in these types of

circumstances.  There is no indication that the grievant's health was

compromised."  (Dkt. 38, Ex. C).

### 2.     Grievance JCF060600910012F

Plaintiff filed a grievance on June 6, 2006 arising from events occurring on

May 26, 2006.  (Dkt. 38, Ex. D).  According to plaintiff's grievance, he learned

while at the U of M (on May 26, 2006) that defendant Gardon had failed to follow

the prescribing physician's order regarding plaintiff's medication, Prograf.  *Id*.

The Step I response provides:

> On 9-14-05, a medication order was written for Prograf
> 1mg, two capsules to be taken twice per day (BID)
> through 12-31-05.  Prograf serum levels were ordered on
> 9-29-05, to be drawn on 10-4-05. From 2-15-06 through
> 8-31-06 Prograf 1mg BID was ordered.  On 5-30-06, a

> memo from the U of M Health System states, "...he
> should be on Prograf 2mg BID." An order was written
> on 6-16-06 to, "Increase Prograf to 2mg BID x five refills
> per Transplant Center U of M.
>
> &ast; &ast; &ast;
>
> Mr. Newson is now receiving the dosage recommended
> by the U of M Transplant Center.

(Dkt. 38, Ex. D). On July 4, 2006, plaintiff submitted a Step II grievance appeal

claiming that the Step I respondent failed to comply with the grievance and

operating procedures and that the issue remained unresolved. *Id*. The Step II

response indicated that the Step I response was issued on July 28, 2006, that

appropriate medical treatment was provided to grievant and his grievance was

denied. *Id*.

Plaintiff then appealed to Step III on October 1, 2006. (Dkt. 38, Ex. D).

Plaintiff wrote that the failure to respond or proffer an "explanation as to why their

action amounted to an interruption of prescribed plan for treatment, is completely

inadequate and totally unacceptable." *Id*. The Step III response was issued on

May 10, 2007:

> All information presented upon appeal to Step III has
> been reviewed. Grievant's allegation is that a nurse
> failed to order his medication. The medical practitioner,
> not nursing staff, is required to review the
> recommendations of off site specialists. According to the
> record, grievant has been receiving and will continue to
> receive all care needed to address his medical needs.

(Dkt. 38, Ex. D).

3.    JCF200612318517A

In October 2006, plaintiff filed a grievance directly to Step III (Step III ID 196485, 17). (Dkt. 38, Ex. G). Plaintiff was directed to submit this grievance at Step I, in accordance with the grievance procedure, which plaintiff did. *Id.* In this grievance, plaintiff named a variety of people, including the Governor, the Director of the Department of Corrections, the Warden, the Deputy Warden and others. Plaintiff also named the MDOC and CMS. *Id.* Plaintiff asserted his medication was inappropriately confiscated and destroyed and that these actions violated several policy directives and procedures. *Id.* Plaintiff complains that a notice of intent or a contraband removal slip should have been prepared and the failure to do so violated policy. Plaintiff also states that Officer Salisbury, who confiscated the medicine, expressed disregard for plaintiff's health and need for the medication, given that the pharmacy was closed on the weekend and he would have to wait several days for more medication. *Id.* Nurse Michelle Slick is also alleged to have thrown the medication away. *Id.*

The Step I response was issued on January 9, 2007. (Dkt. 38, Ex. G). It provides as follows:

> [Plaintiff] stated during the interview that he had removed only one days worth of medication, not the entire blister pack as claimed by staff. Interview with RUO Salisbury who stated that he did remove the medication from Newson's room, however each and

every pill was out of the blister packs and was placed in
an old medicine bottle that had an expiration date prior to
the date of the cell search.  He further states that he took
the items over to health services for the staff to evaluate.
Investigation consisted of Nurse Supervisor Ives
reviewing prisoner Newson's medical file where she did
find an entry about Nurse Michele disposing of
Newson's medication on 10/14/06.  She further states
that there was a 7 day emergency order of the medication
process[ed] and received on 10/14/06.

                              * * *

To date Newson has not proven that staff were in
violations of policy, procedure or protocol.  Staff stated
that Newson had removed the medication from the blister
packs and had placed them into another package making
them contraband. According to the medical entry
Newsons medication were disposed of by medical staff
however they were also ordered and distributed to him on
the same day. According to medical he did not go
without his needed medication.  Mr. Newson is advised
to keep his medication in the blister packs until it is time
for him to take the medication. The grievance is
considered resolved at this step.

(Dkt. 38, Ex. G).

Plaintiff filed a Step II grievance appeal on January 21, 2007.  (Dkt. 38, Ex.

G).  Plaintiff reiterated his claims from Step I and stated that, "had it not ben for

Nurse Mikes efforts, I would have been without all needed medication for at least

10 days.  As it stands, the medication I did receive that evening was a partial issue

of some of the medications, not all."  *Id*.  The Step II grievance response concluded

that plaintiff had offered no evidence of staff misconduct and upheld the Step I

denial.  *Id*.

On February 5, 2007, plaintiff filed a Step III grievance appeal.  (Dkt. 38, Ex. G).  Plaintiff again complained that the contraband confiscation policy, among others, was not followed and that various supervisors condoned the actions of defendants Salisbury and Slick.  *Id.*  The Step III grievance response was issued on September 6, 2007 and indicated that the no evidence of staff misconduct was presented and there was nothing to suggest that further action was required.  *Id.*

    4.      Grievance JCF071202556012F

Plaintiff submitted a grievance on December 1, 2007 for events occurring from April through October 2007.  (Dkt. 38, Ex. E).  Plaintiff wrote that from April through October 2007, he was dispensed half of the appropriately prescribed medication, Prograf, which, at times, left him without this medication for periods of three to 10 days.  *Id.*  Having received no response at Step I, plaintiff filed a Step II grievance appeal on January 25, 2008, stating that his grievance was not resolved because of the refusal to respond to the grievance in a timely manner and that he viewed the response as an admission to the violation of established policies and procedures and the willful interference with prescribed medical treatment. (Dkt. 38, Ex. E).  Defendants did not attach any response to the Step II grievance appeal and none appears elsewhere in the record.  On August 18, 2008, nearly nine months after the Step I grievance was filed and about seven months after the Step II appeal was filed, the Step I response was issued:

Respondent reviewed documentation in the Medication Logs for April through October 2007. Documentation in these logs reveals Mr. Newson received his Prograf on 4-03, 5-25, 6-29, 7-25, 8-23, and 9-19-07 from nursing staff in the Medication Room, receiving two 1mg tablets once daily. An order to renew the Prograf through 12-14-07 was written on 10-05-07, at which time the order was changed to two 1 mg to be taken twice daily. It is noted by Medication Room nursing staff that although he picks up medication as scheduled, he is not dependable in taking it as prescribed.

* * *

Mr. Newson's allegation is not supported as evidenced by documentation maintained in the Medication Room and his medical record. Respondent suggested to him, since this is an anti-rejection medication, he should be very careful to follow the medication dose regimen. Grievance denied as it is without merit.

(Dkt. 38, Ex. E).

Plaintiff filed a Step III grievance appeal on September 20, 2008, stating that the Step I response was late, was answered by the person being grieved (defendant Gardon) in violation of the grievance policy, and that it failed to address the fact that the Medication Room failed to dispense the prescribed dose. (Dkt. 38, Ex. E). The Step III response, dated September 30, 2008 merely states that plaintiff failed to submit a Step II appeal and his grievance was, therefore, rejected at Step III. (Dkt. 38, Ex. E).[1]

## III.   ANALYSIS AND CONCLUSIONS

---

[1] Notably, the MDOC defendants do not argue that this grievance was not exhausted for the reason that plaintiff failed to submit a Step II appeal.

A.    Standards of Review

      1.    Motion to Dismiss under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must first comply with Rule 8(a)(2), which requires "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964 (2007), quoting, *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

The Supreme Court recently raised the bar for pleading requirements beyond the old "no-set-of-facts" standard of *Conley v. Gibson*, 355 U.S. 41, 78 (1957), that had prevailed for the last few decades.  *Courie v. Alcoa Wheel & Forged Products*, 577 F.3d 625, 2009 WL 2497928, *2 (6th Cir. 2009), citing, *Ashcroft v. Iqbal*, — U.S. —, 129 S.Ct. 1937, 1949 (2009); *see also Twombly*, 550 U.S. at 555.  In *Iqbal*, the Supreme Court explained that a civil complaint only survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Iqbal*, 129 S.Ct. at 1949.  The Sixth Circuit observed that this new standard is designed to screen out cases that, while not utterly impossible, are "implausible."  *Courie*, at *2. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal*, 129 S.Ct. at 1949.  And although the Court must accept all well-pleaded factual allegations in the complaint as true, it need not "'accept as true a legal conclusion couched as a factual allegation.'"  *Twombly*, 550 U.S. at 555, quoting, *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see also Iqbal*, 129 S.Ct. at 1949. The Sixth Circuit noted that "[e]xactly how implausible is 'implausible' remains to be seen, as such a malleable standard will have to be worked out in practice." *Courie*, *2.

Where a plaintiff is proceeding without the assistance of counsel, the court is still required to liberally construe the complaint and hold it to a less stringent standard than a similar pleading drafted by an attorney.  *See e.g. Simmons v. Caruso*, 2009 WL 2922046 (E.D. Mich. 2009), citing, *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *Hahn v. Star Bank*, 190 F.3d 708, 715 (6th Cir. 1999). Thus, the Court must still read plaintiff's *pro se* complaint indulgently and accept plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992); *Erickson v. Pardus*, 127 S.Ct. at 2200 (The Court of Appeals improperly departed "from the liberal pleading standards set forth by Rule 8(a)(2)" and failed to "liberally construe" the *pro se* complaint at issue.).

     2.     Summary Judgment

Rule 12(d) also provides that, if the moving party presents and the Court relies on matters *outside* the pleadings, "the motion [under Rule 12(b)(6)] must be treated as one for summary judgment and disposed of as provided in Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. 12(d). Thus, the plain language of the rule requires that if the motion relies on outside materials that the Court considers, then the motion "must" be converted into a motion for summary judgment pursuant to Rule 56. *See Song v. City of Elyria, Ohio*, 985 F.2d 840, 842 (6th Cir. 1993). With respect to defendant's argument that plaintiff failed to exhaust his administrative remedies, the parties submitted, and the undersigned has considered, evidence that is outside the pleadings. Thus, in this respect, the Court will treat defendant Daoust's motion to dismiss as one for summary judgment under Rule 56.

Summary judgment is appropriate under Rule 56(b) "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In *Copeland v. Machulis*, 57 F.3d 476, 478-79 (6th Cir. 1995), the court stated the standard for deciding a motion for summary judgment:

Report and Recommendation
Motions to Dismiss/Summary Judgment
*Newson v. Steele*; 09-10346

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the non-moving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment.  The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

A genuine issue of material fact exists only when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for the non-moving party.  *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

"In deciding a motion for summary judgment, [the] court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  This is not to say that some credibility determinations are beyond what is appropriate in deciding a motion for summary judgment.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1774, 1776 (2007).

B.    Exhaustion of Administrative Remedies

1.    Legal standards

In *Jones v. Bock*, 549 U.S. 199, 127 S.Ct. 910 (2007), the United States Supreme Court held that "exhaustion is an affirmative defense, and prisoners are not required to specifically plead or demonstrate exhaustion in their complaints." *Id*. at 923.  The Court defined the level of detail necessary to exhaust as simply compliance with the administrative grievance process.  *Id*.  Moreover, the burden rests on the defendant to show that a plaintiff failed to exhaust when asserting exhaustion as an affirmative defense.  *Id*.  Accordingly, exhaustion is satisfied if plaintiff complied with the applicable MDOC grievance procedure and defendants bear the burden of showing otherwise.  *Kramer v. Wilkinson*, 226 Fed.Appx. 461, 462 (6th Cir. 2007) (A prisoner-plaintiff "does not bear the burden of specially pleading and proving exhaustion; rather, this affirmative defense may serve as a basis for dismissal only if raised and proven by the defendants.").

A moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001).  "Where the moving party has the burden-the plaintiff on a claim for relief of the defendant on an affirmative defense-his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*,

799 F.2d 254, 259 (6th Cir. 1986). The Sixth Circuit repeatedly has emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561.

       2.     Purpose of exhaustion requirement.

The Supreme Court defines proper exhaustion under 42 U.S.C. § 1997e(a) as "using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 2385, quoting, *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id*. at 2386. The Supreme Court also observed that "[t]he PLRA attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to 'afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" *Id*. at 2387, quoting, *Porter v. Nussle*, 534 U.S. 516, 525 (2002) (alteration omitted). Exhaustion serves a dual purpose: it gives prisoners "an effective incentive to make full use of the prison grievance process and accordingly provides prisons with a fair opportunity to correct their own errors." *Id*. at

2387-88.  Additionally, the exhaustion requirement "has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record."  *Jones*, 127 S.Ct. at 915-16.

Before *Jones* invalidated the additional exhaustion procedures placed on prisoner civil rights suits by the Sixth Circuit, a prisoner was required to "file a grievance against the person he ultimately seeks to sue," and exhaust the claim as to each defendant associated with the claim.  *Curry v. Scott*, 249 F.3d 493, 505 (6th Cir. 2001).  The critical holding in Jones was that the PLRA does not impose additional exhaustion procedures or requirements outside the prison's grievance procedures.  As observed in *Jones*, the primary purpose of a grievance is to alert prison officials of a particular problem.  *Jones*, 127 S.Ct. at 923; *see also Bell v. Konteh*, 450 F.3d 651, 651 (6th Cir. 2006) ("[I]t is sufficient for a court to find that a prisoner's [grievance] gave prison officials fair notice of the alleged mistreatment or misconduct that forms the basis of the constitutional or statutory claim made against a defendant in a prisoner's complaint.").

3.    Defendant Gardon

Plaintiff claims that he obtained a prescription for bottled water because he was getting sick from drinking the prison water. (Dkt. 1). He further alleges that defendant Gardon somehow participated in the denial of his claimed need for bottled water. Gardon states in her affidavit that an accommodation for bottled water was written by a medical provider on September 9, 2008. (Dkt. 38, Ex. F). Given that this request was outside the normal practice, she referred it to the Regional Medical Office to determine medical necessity. The determination to deny bottled water was made by Dr. Pandya, another defendant. *Id.* Regardless of defendant Gardon's involvement in the denial of bottled water, the undersigned is unable to find any grievance in the record pertaining to the need for and denial of bottled water. Thus, the undersigned can only conclude that this grievance is unexhausted and summary judgment should be granted in defendant Gardon's favor on this basis, with respect to any bottled water claims.

Plaintiff contends that defendant Gardon, the JCF Health Unit Manger (HUM), interfered with his medical treatment by falsifying his medical record to change the dosage on one of his prescription medications (Prograf) and prevented Dr. Antonini from increasing the dosage. On June 1, 2006, plaintiff filed Grievance JCF-2006-06-0910-12F alleging that he learned that "JCF office of health care, i.e., HUM Beth Gardon, failed to follow the prescribed doctor's order,"

in a reference to recommendations made by U of M medical staff. According to defendant, there was no allegation in the grievance filed by the plaintiff that Gardon had changed a prescription.  Thus, according to defendant, since plaintiff never raised the issue of Gordon changing a prescription, he did not exhaust such a claim against her.  Plaintiff's second grievance regarding the medication Prograf, Grievance JCF-2007-12-2556-12F, was filed in December of 2007.  In that grievance, plaintiff alleged he had been dispensed half of his Prograf from April 2007 through October 2007.  Defendant Gardon also asserts that plaintiff failed to exhaust any claims pertaining to his Prograf in that grievance because she was not specifically mentioned in the grievance.  Rather, she was reviewer of the Step I grievance response.  Thus, according to defendant, grievance JCF-2007-12-2556-12-F failed to exhaust any claims against Gardon.

The undersigned has a different, and less narrow, view of plaintiff's claims and these grievances.  As to the 2006 grievance, plaintiff clearly alleged in his complaint that defendant Gardon intentionally "interfered" with his medical treatment, specifically, the Prograf prescription.  (Dkt. 1-2, p. 11).  This allegation is also plainly evident from the grievance.  (Dkt. 38, Ex. D).  While the details of this interference set forth in the complaint may not precisely match, sentence for sentence, the details in the grievance, there is no such stringent requirement found in the law of exhaustion.  Moreover, with respect to the 2007 grievance, while

Report and Recommendation
Motions to Dismiss/Summary Judgment
*Newson v. Steele*; 09-10346

defendant does not mention Gardon by name, he claims to have attempted to resolve the issue with the "HUM," which is, undoubtedly, defendant Gardon. Thus, the undersigned suggests that the remaining claims against are, in fact, exhausted and defendant's motion for summary judgment on this basis should be denied.

    C.    <u>Deliberate Indifference - Personal Involvement</u>

        1.    Standards

Liability in a § 1983 action cannot be based on a theory of *respondeat superior*. *See Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 691 (1978). "[T]he mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability." *Id.* at 694 n. 58, citing, *Rizzo v. Goode*, 423 U.S. 362, 370-371 (1976). As the Sixth Circuit has stated:

> Section 1983 liability will not be imposed solely upon the basis of respondeat superior. There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.

*Taylor v. Michigan Dep't of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995), quoting, *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).

Several cases from the Sixth Circuit provide guidance on a supervisory liability claim. For example, the court has stated that "[p]laintiff must prove that [the supervisor defendants] did more than play a passive role in the alleged violations or show mere tacit approval of the goings on. Plaintiff must show that the supervisors somehow encouraged or condoned the actions of their inferiors." *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) (internal and external citations omitted). Furthermore, the Sixth Circuit has stated:

> Supervisor liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he [she] fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences.

*Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002), quoting, *Braddy v. Fla. Dep't of Labor & Employment Sec.*, 133 F.3d 797, 802 (11th Cir. 1998). Also, the Court has held that where the defendants' "only roles ... involve the denial of administrative grievances or the failure to act ... they cannot be liable under § 1983." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[L]iability under § 1983 must be based on active unconstitutional behavior and cannot be based

upon 'a mere failure to act.'"  *Id*. at 300, citing, *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998).  Claims that are based simply on the denial of a grievance do not state a claim of constitutional dimension.  *See Martin v. Harvey*, 2001 WL 669983, *2 (6th Cir. 2001) ("The denial of the grievance is not the same as the denial of a request to receive medical care."); *Shehee*, 199 F.3d at 300) (as against defendants whose only involvement was the denial of administrative remedies and the "failure to remedy the alleged retaliatory behavior[,]" "[t]here is no allegation that any of these defendants directly participated ... in the claimed ... acts[ ]."); *Weaver v. Toombs*, 756 F.Supp. 335, 337 (W.D. Mich. 1989) ("The mere fact that these defendants found plaintiff's ... grievance concerning the seizure to be without merit is insufficient to state a claim against them.").  Furthermore, an allegation that a supervisor was aware of an actionable wrong committed by a subordinate and failed to take corrective action "is insufficient to impose liability on supervisory personnel under § 1983."  *Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988).  "[A] failure of a supervisory official to supervise, control, or train the offending individual officers is not actionable absent a showing that the official either encouraged the specific incident of misconduct or in some other way directly participated in it.  At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or

knowingly acquiesced in the unconstitutional conduct of the offending officers."
*Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir. 1982).

      2.     Defendant Wilson

      Plaintiff alleges that defendant Wilson would not let him to go JCF Health
Care on February 5, 2005 so that he could take the thirteen medications prescribed
for him to fight liver rejection after he was discharged from the U of M hospital on
February 4, 2005 following an episode of respiratory failure, "phenomena," and
possible liver transplant rejection.  Plaintiff asserts that he was hospitalized on
February 6, 2005 and was close to death as a result of Wilson's retaliatory refusal
to give him his medications.  (Dkt. 1, pp. 21-32).  Defendant Wilson contends that
plaintiff cannot show that she prevented him from obtaining his medications on
February 5, 2005 because she was not employed at the facility on that date.
Rather, she began her employment as a registered nurse at the facility several
months after the alleged incident. (Dkt. 38, Ex. A).  In response, plaintiff says that
he was given defendant Wilson's name as the nurse who denied him treatment on
the date in question.[2]  (Dkt. 47, p. 8).  Given the lack of any material dispute that
defendant Wilson did not work at the correctional facility at the time of the events

---

    [2] Plaintiff suggests that the Court should allow him additional discovery to
learn the correct identity of the person who denied him care.  The undersigned is
not aware of anything that would have prevented plaintiff from conducting
discovery on this issue.

about which plaintiff makes claims, the undersigned suggests that summary judgment be granted in defendant's favor for lack of any personal involvement in the alleged violation of plaintiff's constitutional rights.  In light of this conclusion, the undersigned suggests that defendant Wilson's other arguments, including lack of exhaustion, need not be addressed.

### 3.    Defendant Gardon

Defendant Gardon asserts that plaintiff cannot show that she was personally involved because she did not (and could not, as a nurse) prescribe his medication. (Dkt. 38, pp. 7-8).  In addition, defendant argues that plaintiff's allegations are "based solely on a hearsay assertion of someone at U of M with Defendant Gardon," which is improper hearsay.  *Id.*  However, in the view of the undersigned, plaintiff is not claiming that Gardon should have written a prescription for him, rather, his claim is that she intentionally interfered with his receipt of the correct dosage of medication.  On this record, the Court cannot determine the amount of medication plaintiff was supposed to receive, whether he in fact received it, or the role of Gardon in this process.[3]  Gardon's assertions that she cannot prescribe medication simply does not address the claim made by plaintiff that she interfered

---

[3]  Notably, while the assertion is made in the grievance responses that plaintiff received the correct doses as prescribed, no such evidence is presented by defendant for the Court's consideration.  Thus, regardless of whether the alleged statement to Gardon is hearsay, there is no evidence of the medication prescriptions or logs dispensing medication before the Court.

with his receipt of the correct dosage of medication.  Under these circumstances and on this record, the undersigned believes that there is sufficient material evidence establishing a question of fact as to whether Gardon was personally involved in allegedly interfering with the administration and receipt of plaintiff's medication.  Thus, the undersigned suggests that defendant Gardon's motion for summary judgment on this basis should be denied.

4.    Defendant Slick

Plaintiff contends that defendant Slick violated his rights by acting with deliberate indifference when she disposed of medications an officer had confiscated from his cell on October 14, 2006.  (Dkt. 1).  Defendant acknowledged that claims that a prisoner has been denied prescribed medication may constitute a violation of his federal rights, but argues that this is not the case here, because defendant Slick did not deny plaintiff his prescription medication.  While plaintiff's medication was confiscated, according to defendant, the medication was replaced on the same day, after plaintiff notified Health Care staff of the seizure. (Dkt. 38, Exs. G, H).  Thus, defendant argues, plaintiff was not deprived of his medications.  According to plaintiff, he did not receive all of his medications that same day.

In the context of failure to provide prescription medications, some cases hold that where a prisoner offers no evidence showing any adverse consequences

from the delays in the receipt of his medications, a deliberate indifference claim fails. *Gillard v. Kuykendall*, 295 Fed.Appx (8th Cir. 2008), citing, *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (objective seriousness of delay in treatment must be measured by reference to effect of delay, which must be shown by verifying medical evidence). Similarly, other courts have held that where the delay in receipt of prescription medications is insignificant (no longer than seven days) and the prisoner suffered no lasting physical harm from the delay, a deliberate indifference claim fails. *Williams v. Arnold*, 207 Fed.Appx. 980, 985 (11th Cir. 2006). A serious medical need generally falls into one of two categories (1) a medical need diagnosed by a physician as requiring treatment; or (2) a medical need that is so obvious that a lay person would easily recognize the necessity for a doctor's attention. *Monmouth County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir.), *cert. denied*, 486 U.S. 1006 (1988). As to the latter category, "an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Dodson*, at *4, quoting, *Napier*, 238 F.3d at 742. As the Sixth Circuit explained in *Blackmore v. Kalamazoo Co.*, 390 F.3d 890, 898 (6th Cir. 2004):

> *Napier* applies where the plaintiff's "deliberate indifference" claim is based on the prison's failure to treat a condition adequately, or where the prisoner's

> affliction is seemingly minor or non-obvious. In such
> circumstances, medical proof is necessary to assess
> whether the delay caused a serious medical injury.

According to plaintiff, defendant Slick assisted in the destruction of his

medication.  However, plaintiff offers no verifying medical evidence that a delay in

the receipt of replacement medications (if any existed) caused him a serious

medical injury.  Thus, plaintiff has failed to establish a genuine issue of material

fact with respect to his claim against defendant Slick and the undersigned suggests

that summary judgment should be granted in her favor.

> 5.    Defendant Gilbert

Plaintiff alleges that Gilbert refused to help him get the medications he

needed and that were prescribed to him and failed to stop the retaliatory actions

taken against plaintiff.  (Dkt. 1).  In his response to defendants' motion, plaintiff

claims that he asked Gilbert for help and she refused to do so even though she had

a legal duty to protect him. This vague allegation is insufficient to sustain a

deliberate indifference claim.  The undersigned is unable to discern even the most

basic alleged facts (when this occurred, whether plaintiff filed a grievance, what

was the specific nature of the request, etc.).  The undersigned suggests that

plaintiff's deliberate indifference claim against Gilbert fails and should be

dismissed.

According to plaintiff, Gilbert also threatened to have him transferred if he continued to file grievances.  Plaintiff may be attempting to assert a First Amendment retaliation claim.  A prisoner retains First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.  *See Pell v. Procunier*, 417 U.S. 817, 822 (1974).  Retaliation based on a prisoner's exercise of his or her constitutional rights violates the Constitution.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).  To establish a First Amendment retaliation claim, the plaintiff must prove that: (1) the plaintiff engaged in activities protected by the Constitution or statute; (2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) that this adverse action was taken at least in part because of the exercise of the protected conduct.  *Id*. Conclusory allegations are insufficient to show that a defendant was motivated by the exercise of a plaintiff's First Amendment rights.  *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996).  Bare allegations by the plaintiff of malice on the part of a defendant are not enough to establish retaliation claims.  *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998).  Moreover, "temporal nexus" is a factor in determining a causal connection in a First Amendment retaliation claim.  *Mulazim v. Corrigan*, 7 Fed.Appx. 427 (6th Cir. 2001).

Plaintiff has neither made sufficient allegations or come forth with any evidence to support a retaliation claim. The threat of transfer to another facility is insufficient. Indeed, even an actual transfer to another prison at the same security level is not considered sufficiently adverse to deter a person of ordinary firmness from exercising his First Amendment rights. *Smith v. Yarrow*, 78 Fed.Appx. 529, 543 (6th Cir. 2003); *Mandela v. Campbell*, 1999 WL 357825, at *3 (6th Cir. 1999). Plaintiff has not alleged the existence of a sufficiently adverse action that was taken against him as the result of his exercise of a protected constitutional right to properly state a claim cognizable under § 1983. Thus, any retaliation claim asserted against Gilbert should be dismissed.

### 6.    Defendants Caruso, Straub, and Armstrong

Defendants claim that plaintiff's claims against them are based solely on a vicarious liability theory, which is not permitted under § 1983. Plaintiff asserts that these defendants are "supervisory agents" of the MDOC and as such, claims under § 1983 may be brought against them for their personal roles in implementing or enforcing a policy in a way that deprives an individual of his or her constitutional rights. (Dkt. 47, pp. 14-15). In his complaint, plaintiff alleges that Caruso, Straub, and Armstrong refused to stop the retaliatory action taken against him. (Dkt. 1-2, pp. 21-26). Plaintiff also alleges that, under the grievance

procedure, Step III appeals are filed with Caruso's office, and her staff reviews them, so she is bound by their actions.  *Id.*

In the view of the undersigned, plaintiff's claim against defendant Caruso is nothing other than a run-of-the-mill *respondeat superior* claim, which is insufficient to state a claim under § 1983.  Indeed, an allegation that a supervisor was aware of an actionable wrong committed by a subordinate and failed to take corrective action "is insufficient to impose liability on supervisory personnel under § 1983."  *Poe*, 853 F.2d at 429; *see also Hays*, 668 F.2d at 874 ("[A] failure of a supervisory official to supervise, control, or train the offending individual officers is not actionable absent a showing that the official either encouraged the specific incident of misconduct or in some other way directly participated in it.  At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.").

With respect to the claims against Straub and Armstrong, plaintiff claims that they reviewed and denied his grievances.  He also claims that Straub, like Caruso, failed to prevent or address the alleged retaliatory actions taken against him.  (Dkt. 1-2, p. 23).  And, plaintiff alleges that Armstrong, through his denial of a grievance, recommended that medical treatment be denied to plaintiff.  (Dkt. 1-2, p. 26).  In essence, plaintiff's claims are based on Straub's and Armstrong's failure

to act and their denial of grievances.  These claims must fail.  *Shehee*, 199 F.3d at 300 (The Court has held that where the defendants' "only roles ... involve the denial of administrative grievances or the failure to act ... they cannot be liable under § 1983."); *Martin v. Harvey*, 2001 WL 669983, *2 (6th Cir. 2001) ("The denial of the grievance is not the same as the denial of a request to receive medical care."); *Shehee*, 199 F.3d at 300) (as against defendants whose only involvement was the denial of administrative remedies and the "failure to remedy the alleged retaliatory behavior[,]" "[t]here is no allegation that any of these defendants directly participated ... in the claimed ... acts[ ]."). Thus, the undersigned suggests that the claims against defendants Caruso, Straub, and Armstrong be dismissed.

D.      Plaintiff Fails to State a Claim Against CMS

In order to state a cause of action under 42 U.S.C. § 1983, two essential elements are required: (1) there must be conduct committed by a person acting under color of state law, and (2) the conduct must deprive the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; *Parratt v. Taylor*, 451 U.S. 527 (1981); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Jones v. Duncan*, 840 F.2d 359, 361-62 (6th Cir. 1988).  If either element is missing, then a claim under § 1983 has not been stated.  *Christy v. Bandlett*, 932 F.2d 502, 504 (6th Cir. 1991).  In the present motion, there is no challenge to the claim that defendants were acting under color of state law.

CMS correctly states that a plaintiff bringing an action pursuant to § 1983 may not base liability on a theory of *respondeat superior* or vicarious liability. *Moore v. Michigan Dep't of Corrections*, 2007 WL 3124649, *4 (W.D. Mich. 2007), citing, *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 98 (1978).  Rather, under *Monell*, liability can only be found in situations where a deprivation of constitutional rights occurs as a result of an entity's policy, custom, or practice. *Raub v. Correctional Medical Services*, 2008 WL 160611, *2 (E.D. Mich. 2008), citing, *Monell*, at 694.  Moreover, there must be an "affirmative link between the policy and the particular constitutional violation alleged."  *Raub*, at *2, quoting, *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).  "There must be more than merely a right to control employees, as plaintiff must show that CMS at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending employees."  *Moore*, at *4, citing, *Walton v. City of Southfield*, 995 F.2d 1331, 1340 (6th Cir. 1993).

CMS claims that plaintiff's complaint does not identify a specific "policy" instituted by CMS that plaintiff claims violated his constitutional rights.  The undersigned agrees that plaintiff's complaint is insufficient to state a policy, pattern, or practice claim against CMS.  Rather, plaintiff only makes conclusory and vague allegations that his alleged mistreatment was the result of a cost-cutting policy instituted by CMS.  Even construing plaintiff's complaint indulgently, he

has failed to allege that any pattern, policy, or practice of CMS is implicated by his claims.  As such, plaintiff's allegations against CMS, at best, merely "create speculation" or a "suspicion" of a legally cognizable claim and his claims against CMS should be dismissed.  *See Bredesen* and *Twombley*, *supra*.

Given the conclusions reached above, the undersigned suggests that it is unnecessary to reach the other grounds on which defendants have moved to dismiss the complaint.

D.    Eleventh Amendment Immunity

Plaintiff alleges in his complaint that the suit is against defendants in their official and personal capacities.  A suit against a public official in their "official capacity" is a suit against the public entity that employs the public official.  *Grinter v. Knight*, 532 F.3d 567, 572 (6th Cir. 2008), citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  In this case, defendants are employed by the State of Michigan so a suit against them in their official capacity is a suit against the State of Michigan.  "The Eleventh Amendment bars suits brought in federal court against a state and its agencies unless the state has waived its sovereign immunity or consented to be sued in federal court."  *Id*.  The record does not indicate that the State of Michigan has waived its immunity or otherwise consented to being sued and, therefore, the claim cannot be maintained against defendants in their official

capacity.  However, the Eleventh Amendment does not bar suit against defendants in their individual capacity under 42 U.S.C. § 1983.

E.    Qualified Immunity

Defendants claim to be entitled to qualified immunity regarding their actions in this case.  The doctrine of qualified immunity means that "'[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Caldwell v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992), quoting, *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Defendants bear the burden of pleading qualified immunity, but plaintiff bears the burden of showing defendants are not entitled to qualified immunity.  *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002).

The Supreme Court had established a two-part test in order to determine whether qualified immunity was applicable to a particular situation.  *Saucier v. Katz*, 533 U.S. 194 (2001).  The first part of the test involved a determination of whether the facts of the case, viewed in the light most favorable to the plaintiff, "show the officer's conduct violated a constitutional right."  *Id*. at 201.  If the first question was resolved in the affirmative then the court would decide "whether the

right was clearly established." *Id.* If both questions are resolved in the affirmative, then the doctrine of qualified immunity does not apply and the case can proceed.

Recently, the Supreme Court revisited their decision in *Saucier* and concluded that mandatory order of the two part test for determining if qualified immunity applied was no longer sound based on several factors including judicial economy. *Pearson v. Callahan*, — U.S. —, 129 S.Ct. 808 (2009). While not modifying the factors that should be considered in such a decision, the Court held that sometimes it makes sense to allow the second part of the test to be decided first and that such a decision may resolve the controversy without having to address the first part of the test. In *Pearson*, the § 1983 claim of the plaintiff was based on an allegedly unlawful search conducted by the defendant police officers. Without having to engage in the perhaps more complicated decision of determining whether plaintiff's constitutional rights had been violated, the Court found that the constitutional right claimed by plaintiff was not clearly established where lower court case law was consistent with the conduct of the officers and "principles of qualified immunity [should] shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law."

Given the foregoing conclusion that there are questions of fact pertaining to some of plaintiff's Eighth Amendment claims against defendant Gardon, the undersigned cannot say that she is entitled to qualified immunity. *Brandenburg v.*

*Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989) (When "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury," the "jury becomes the final arbiter of [a] claim of immunity."); *Bouggess v. Mattingly*, 482 F.3d 886, 888 (6th Cir. 2007). Given the foregoing recommendations regarding the claims against the other moving defendants, the issue of qualified immunity need not be further addressed.

## IV.   RECOMMENDATION

Based on the foregoing, the undersigned **RECOMMENDS** that the MDOC defendants' motion to dismiss be **GRANTED** in part, that the MDOC defendants' motion for summary judgment be **GRANTED** in part, and that CMS's motion to dismiss be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,

1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Administrative Order 09-AO-042.  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: January 14, 2010                          s/Michael Hluchaniuk
                                                Michael Hluchaniuk
                                                United States Magistrate Judge

## <u>CERTIFICATE OF SERVICE</u>

     I certify that on January 14, 2010, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send electronic notification to the following: <u>Julia R. Bell, Brian J. Richtarcik, and Randall A. Juip</u>, and I certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s): <u>Maurice Newson, # 370171, G. ROBERT COTTON CORRECTIONAL FACILITY, 3500 N. Elm Road, Jackson, MI 49201</u>.

                         <u>s/Tammy Hallwood          </u>
                         Case Manager
                         (810) 341-7887
                         tammy_hallwood@mied.uscourts.gov